UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

ANGELA DELOZIER,                    )
                                    )
        Plaintiff,                  )
                                    )        Case No. 1:13-cv-37
v.                                  )
                                    )        Judge Curtis L. Collier
BRADLEY COUNTY BOARD OF             )
EDUCATION and JOHNNY McDANIEL,      )
                                    )
        Defendants.                 )

**M E M O R A N D U M**

As a result of juvenile and locker room behavior at a Bradley County high school, former

Assistant Band Director Angela Delozier ("Plaintiff") has brought this employment discrimination

case against Defendants Bradley County Board of Education ("BCBE") and Johnny McDaniel

("McDaniel") (collectively "Defendants").  Defendants have filed a motion for summary judgment

(Court File No. 21), arguing Plaintiff has not presented sufficient evidence to support her claims for

sex discrimination, hostile work environment, and retaliation.  Plaintiff responded in opposition to

Defendants' motion (Court File No. 25) and Defendants filed a reply (Court File No. 30).  For the

following reasons, the Court will **GRANT IN PART and DENY IN PART** Defendants' motion

for summary judgment (Court File No. 21).  Specifically, the Court will **DISMISS** the Section 1983

claims and **DISMISS** all claims against McDaniel in his individual capacity.


I.      **FACTUAL BACKGROUND**

        Plaintiff met Kristan ("Kris") Ware ("Ware") in 2003 while the two were students at Lee

University in Cleveland, Tennessee.  Sharing in common some of the same music-related

extracurricular activities and both playing in the church orchestra, they became friends soon after

meeting. In 2010 Ware became the band director at Bradley Central High School ("Bradley Central"). Plaintiff spent the 2009-2010 school year as the band director at a middle school in Marion County, Tennessee. Ware recommended Plaintiff apply for the assistant band director position that would be opening up at Bradley Central the following school year. Ware attended Plaintiff's interview with Bradley Central administrators, including Principal Todd Shoemaker ("Shoemaker"). She was hired to begin during the 2010-2011 school year.

Shoemaker, whose role included recommending personnel decisions to BCBE Director of Schools Johnny McDaniel ("McDaniel"), took into account Ware's opinion of Plaintiff during the hiring process given Ware's role as band director (Court File No. 25-2, Shoemaker Dep., p. 35). As band director, Ware was responsible for setting the assistant band director's responsibilities and delegating tasks to her (id. at pp. 33-34; Court File No. 25-3, Ware Dep., pp. 47, 79). He generally made the final decisions regarding how the band was run.[1] However, the band director was not responsible for providing performance reviews of the assistant band director and had no formal authority over renewing or terminating the assistant band director's contract (Court File No. 22-3, Ware Dep., pp. 87, 181, 183).

During the 2010-2011 school year, Ware and Plaintiff got along well and maintained a good friendship. During the 2011-2012 year, however, their relationship deteriorated. Ware made several inappropriate comments to Plaintiff, some of which are undisputed. According to Plaintiff, in front of students Ware would say derisively that it must be Plaintiff's "time of the month" and that she

---

[1] Ware explained that, in his opinion, the band director is "pretty much the last stop in the decision-making. The assistant is there to assist but at the same time when the director makes a decision, that's the final decision. And so when the director makes a decision for good or bad, they take the credit and they also take the fall" (Court File No. 25-3, Ware Dep., p. 47).

2

was "bi-polar"[2] (Court File No. 25-1, Delozier Dep., pp. 118-19).

During an incident in December 2011, a romantic interest of Plaintiff sent her flowers at work, which Plaintiff put in the band room. It is undisputed that Ware and several male students began questioning Plaintiff about the mystery suitor. She would not say who he was, however, as the courtship was still in its infancy. Ware, who admits he instigated the line of questioning, would not relent and instead "kept plugging" (Court File No. 25-3, Ware Dep., p. 126). Ware then asked Plaintiff whether she sent the flowers to herself (*id.*). As Plaintiff recounts, Ware next suggested she had received the flowers from her "lesbian lover" (Court File No. 25-1, Delozier Dep., p. 112). She recalled that one student chimed in that the attached card probably said "had a great time last night," to which Ware responded, "yeah, so she sent them to herself" (*id.* at pp. 112-13). Plaintiff took this to mean that "I played with myself the night before and gave myself flowers because it went so well" (*id.* at 113). Ware denies saying anything about Plaintiff having a lesbian lover and said in his deposition that his comment about Plaintiff sending herself flowers was not made to suggest Plaintiff pleasured herself but was made simply "because whenever a girl wants to make herself feel better, she sends herself flowers" (Court File No. 25-3, Ware Dep., p. 126). Two days later, Plaintiff recalled, she told Ware how inappropriate the conversation was, but he did not apologize or take ownership for it (Court File No. 25-1, Delozier Dep., p. 117).

Later that spring, Ware asked Plaintiff to remove her keyboard stand from the band room. Plaintiff's then-boyfriend (the one who sent the flowers and is now her husband) was going to help her move the stand with his truck, but he kept getting pulled away by family commitments. Ware

---

[2] While being called bi-polar is not inherently sex-based, it might be considered part of a pattern of sexual harassment if used in conjunction with sex-based insults, especially ones similarly suggestive of moodiness, such as referring to a woman's "time of the month."

admitted that he said to Plaintiff, in front of a room of students, "you've got a man now and he can do this for you" (Court File No. 25-3, Ware Dep., p. 139). Plaintiff recalled that Ware followed this by saying her,"needs to figure out what's more important—you or his family" (Court File No. 25-1, Delozier Dep., p. 124).[3] The students erupted in laughter upon a further comment by Ware, which Plaintiff did not hear (*id.*). Plaintiff was very distressed by the incident (*id.*).

Ware stated that during the 2011-2012 year he felt Plaintiff had become "a little bit more complacent and didn't spend as much effort in her classroom" (Court File No. 25-3, Ware Dep., p. 107). Plaintiff noted that she was given more duties and worked longer hours in the second year (Court File No. 25-1, Delozier Dep., pp. 101-02). In any event, it is undisputed that her performance reviews were universally excellent both years (Court File 25-9, Exhibit 9). The incidents described above, however, led to interpersonal problems between Plaintiff and Ware.

By March, Plaintiff realized she needed to confront Ware head-on about his comments and what she perceived as his lack of respect. It is undisputed that they had a fifteen- or twenty-minute phone call where Plaintiff expressed numerous complaints about Ware's behavior. In addition to smaller, work-related issues, she confronted him about the flowers incident, the keyboard stand incident, and his calling her bi-polar and saying it was her "time of the month" in front of students (Court File No. 25-1, Delozier Dep., p. 140). Plaintiff filed with the Court a copy of notes she wrote for herself, which she used as a reference during the conversation (Court File No. 25-8). Her notes indicated she was going to report Ware for sexual harassment if the behavior did not stop (*id.*). Ware does not remember her saying this. However, Ware's wife, Holly Ware ("Holly"), stated that

---

[3] Ware remembered saying to Plaintiff, "what's more important, the band or your family," referring to Whitney as her family (Court File No. 25-3, Ware Dep., p. 139).

Ware immediately called her to relate that Plaintiff said she would report Ware for sexual harassment if he did not stop (Court File No. 25-4, Holly Dep., pp. 19-20).[4]

Following the conversation, Plaintiff thought things had improved between her and Ware and they were communicating better (Court File No. 25-1, Delozier Dep., pp. 145, 147). Ware admitted, however, that after Plaintiff confronted him, he no longer wanted to work with her and thought his comments upset her "to the point of no return" (Court File No. 25-3, Ware Dep., p. 158-59). Ware also admits that soon after Plaintiff confronted him, he arranged a meeting with Principal Shoemaker to discuss the matter. Ware recalled that he "didn't disclosure the full conversation," but "did talk to him about certain aspects of it," including "the [job] performance aspects of it" (*id*. at p. 162). Asked in deposition, "do you recall which things you disclosed and which you didn't," Ware replied, "No, I do not" (*id*. at 163). Shoemaker similarly recollects little of the conversation, other than that Ware told him Plaintiff was mad at Ware and it had something to do with picking up a piano and that Plaintiff and Ware were not communicating (Court File No. 22-1, Shoemaker Dep., pp. 40; Court File No. 25-2, Shoemaker Dep., p. 43).

Prior to the conversation between Ware and Shoemaker, neither Ware nor anyone else had brought complaints about Plaintiff to Shoemaker (*id*. at 163-64). After the conversation, Shoemaker made several attempts over the following days to locate Plaintiff in the band room during her planning periods in order to discuss the matter (*id*. at 43). Each time, however, he could not find her there and she had not signed out (*id*.). He never emailed or called her to set up a time to speak

---

[4] This is not hearsay because it is not being used for the truth of the matter asserted but to show Ware's understanding of the conversation or state of mind—i.e., that he thought Plaintiff threatened to report him for harassment. And with regard to the second layer of potential hearsay (Ware as the declarant), Plaintiff may introduce this as a statement of a party opponent under Fed. R. Evid. 801(d)(2)(A).

5

(*id.*).    One of the duties of both the band director and assistant band director was to go to nearby Lake Forest Middle School ("Lake Forest") to help develop band students there. Ware had this responsibility during the fall semester, and during the spring semester Plaintiff would go to Lake Forest during the second of four periods.  Instructors were not expected to sign out when going to Lake Forest.  Plaintiff would then sometimes take her lunch break and third period planning time at home.  There is no dispute that teachers were allowed to take lunch anywhere they would like as long as they did not have lunch duty.  They were also allowed to spend planning periods off campus, though they were supposed to sign out when doing so.  However, Ware knew Plaintiff was taking some planning periods away from school and never told her not to or to sign out when doing so (Court File No. 25-3, Ware Dep., pp. 109, 116).  Ware does not deny he also left school for various reasons during his planning periods without signing out.  He claims that sometimes he was given permission by Shoemaker to leave without signing out, but Shoemaker said he did not remember ever giving such permission (Court File No. 25-25, Ware Exhibit Correction Sheet; Court File No. 25-2, Shoemaker Dep., pp. 30-31).

    In any event, after meeting with Ware and failing on several occasions to find and speak to Plaintiff during her planning period,[5] Shoemaker concluded that Plaintiff should not be renewed because (1) "she wanted to be somewhere else" and (2) "there was some kind of issues going on between her and Kris" (Court No. 25-2, Shoemaker Dep., p. 47; Court No. 25-19, Answer to Interrogatory No. 1).  He never cited Plaintiff's absence from school as a reason for nonrenewal but said he felt it was indicative of Ware and Plaintiff not communicating (Court File No. 22-1,

---

[5] In addition to the points made above, Plaintiff also provides numerous other reasons why she would not have always been in the band room during her planning period.  *See* Court File No. 25, pp. 14-15

6

Shoemaker Dep., p. 49) ("There's definitely communication issues because if she's not there during her planning time, then, you know, something's going on.").

On May 22, 2012, several days after Plaintiff received her latest positive performance evaluation, Shoemaker informed her that her contract was not being renewed for the following school year. According to Plaintiff, Shoemaker refused to specify why she was not being renewed other than stating that "Kris Ware and I had a meeting and decided this is the best course of action" (Court File No. 25-1, Delozier Dep., p. 161). Asked in deposition if he had said that, Shoemaker replied that he "can't remember the conversation we had" (Court File No. 25-2, Shoemaker Dep., p. 82-83).

Within hours of being notified that her contract would not be renewed, Plaintiff received a Facebook message from Ware's wife accusing Plaintiff of "running [her] mouth about Kris to people in town," and asking "how does it feel to be blindsided like you blindsided us?" (Court File No. 25-14). Holly admitted in deposition that when she asked how it felt to "blindsided," she was referring to Plaintiff's contract not being renewed (Court File No. 25-4, Holly Dep., p. 28).

Plaintiff sought a meeting with the school district's upper administration, sending them an email outlining her complaint of sexual harassment and attaching her notes from the call where she confronted Ware. She met with Shoemaker and Bradley County Schools Secondary Supervisor Dan Glasscock ("Glasscock"). According to Plaintiff, Glasscock told her that her contract was not renewed because she and Ware had problems and she had to go because Ware was the band director and she was the assistant director, which he compared to a conflict between an assistant and head football coach (Court File No. 25-1, Delozier Dep. p. 172). She also recalled that he told her Ware told Glasscock that Ware did not feel comfortable working with Plaintiff after she accused him of

7

sexual harassment (*id.* at 172-73). In his deposition, Glasscock stated that, aside from holding the meeting with him, Shoemaker, and Plaintiff, he did not conduct interviews regarding what he admits was an allegation of sexual harassment (25-11, Glasscock Dep., p. 58). He closed the inquiry after the meeting, and Plaintiff was later replaced with a male employee.

After filing a discrimination claim with the Equal Employment Opportunity Commission, Plaintiff filed the instant suit in February 2013.

## II.    STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based merely on its allegations; it must submit significant probative evidence to support its claims. *See Celotex*, 477 U.S. at 324; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Should the non-movant fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains

8

sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should enter summary judgment. *Id.* at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III. DISCUSSION

Plaintiff's amended complaint asserts violations of the First and Fourteenth Amendments pursuant to 42 U.S.C. § 1983, as well as gender discrimination, hostile work environment, and retaliation claims in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. §§ 4-21-301 *et seq.*

### A. Title VII and the THRA

"[T]he Tennessee Supreme Court has repeatedly recognized the application of federal law to THRA cases." *Day v. Krystal Co.*, 471 F. Supp. 2d 874, 883 (E.D. Tenn. 2007) (citing *Parker v. Warren County Utility Dist.*, 2 S.W.3d 170, 172 (Tenn. 1999) (recognizing the Tennessee legislature intended the THRA "to be coextensive with federal law"); *Frizzell v. Southwest Motor Freight*, 154 F.3d 641, 646 (6th Cir. 1998)). The Court therefore analyzes Plaintiff's THRA and Title VII claims "under the relevant federal standards." *Id.*

#### 1. Hostile Work Environment

A hostile work environment claim requires that an employee prove (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual, racial, or religious harassment; (3) the harassment complained of was based on her sex, race, or religion; (4) the charged harassment created a hostile work environment; and (5) the employer is liable. *Randolph v. Ohio Dep't of Youth*

9

*Servs.*, 453 F.3d 724, 733 (6th Cir. 2006); *Hafford v. Sedner*, 183 F.3d 506, 512 (6th Cir. 1999). Here, Defendants focus on the last two elements, arguing that any sexual harassment that occurred did not create a hostile work environment and, even it did, the BCBE cannot be held liable.[6]

### a. Hostile Environment

Not all objectionable conduct rises to the level of actionable harassment. The conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Title VII does not create "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998). The Court examines the totality of the circumstances to determine whether an environment is hostile or abusive. Factors include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Not only must the conduct be objectively hostile or abusive, the victim must "subjectively perceive the environment to be abusive." *Id.* at 21.

Defendants argue that even if Plaintiff's allegations are true, Ware's conduct did not rise to the level of creating a hostile environment. Defendants note that there is no liability under Title VII for "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quoting B. Lindemann & D. Kadue, *Sexual Harassment in Employment Law* 175 (1992)).

---

[6] The first three elements are met as Plaintiff is a women who—when the evidence is viewed in the light most favorable to her—was subject to sexual harassment because she was a women. Comments about her "time of the month," her "having a man now" to help her move heavy things, and her having a "lesbian lover" or having sent herself flowers after pleasuring herself clearly amount to sexual harassment on the basis of her sex.

10

Viewing the facts in the light most favorable to Plaintiff, (1) on more than one occasion Ware said in a derisive manner in front of students that Plaintiff was experiencing that "time of the month"; (2) Ware told Plaintiff in front of a class of students that she "[has] a man now" who could help move a keyboard stand but that the man needed to "figure out what's more important—you or his family;" and (3) Ware badgered Plaintiff in front of male students about who sent her flowers, offering that perhaps they were sent by her "lesbian lover" and indicating that, in the alternative, Plaintiff sent them to herself after pleasuring herself the night before. Such comments, made in front of students who Plaintiff was expected to teach, could only work to undermine her authority and stature in the students' eyes, thereby making her ability to control, influence, and direct the students much more difficult. Moreover, such comments coming from the band director would communicate to the students that the band director himself held Plaintiff in slight regard. It could only be expected that the students would follow the band director's example and also hold Plaintiff in slight regard.

The Court concludes that the frequency of the alleged misconduct along with their nature favors the presence of a hostile work environment, as there were at least four incidents during only a few months. The severity of the incidents more strongly supports such a conclusion: the alleged behavior occurred in front of numerous high school students under Plaintiff's tutelage, creating acute embarrassment for her. In particular, Ware's alleged comments during the flowers incident are quite egregious and would have caused mortification to any reasonable person. These events meet both the objective and subjective test for a hostile work environment. Accordingly, the Court concludes that the facts before the Court could allow a jury to find that Ware engaged in behavior which is

11

legally sufficient to create a hostile work environment.[7]

### b. Employer Liability

An "employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher*, 524 U.S. at 807; *see also Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013) ("If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable.")[8] If the hostile environment was created by a co-worker, on the other hand, a plaintiff must show that "the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action." *Vanover v. White*, 3:07-CV-15, 2008 WL 2713711 (E.D. Tenn. July 10, 2008) (quoting *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir.2008)).

### i. Supervisor

Thus the first question is whether Ware was Plaintiff's supervisor. In the 2013 case *Vance v. Ball State University*, the United States Supreme Court cured a circuit split regarding the

---

[7] Defendants argue that because Plaintiff was able to continue doing her job well, as evidenced by her high scores on performances reviews, Ware's comments must not have altered the terms and conditions of her employment. But as Plaintiff points out, a "plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment. The employee need only show that the harassment made it more difficult to do the job." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 567 (6th Cir. 1999) (quoting *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir.1988)). Here, it is easy to see that because the alleged sexual harassment occurred in front of students (and in at least one case, the students joined in), it made it harder for Plaintiff to serve as a leader in the classroom and enjoy the respect of her students, thus making her job more difficult.

[8] If no tangible employment action is taken, "the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Vance*, 133 S. Ct. at 2439 (citing *Faragher*, 524 U.S. at 807).

definition of "supervisor," holding that "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." 133 S. Ct. at 2439. A tangible employment action is one that effects a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 2443 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).[9] There is a "clear distinction between supervisors and co-workers." *Id.* As the Supreme Court explained, "[t]here is no hint in [the Court's precedent] that the Court had in mind two categories of supervisors: first, those who have such authority and, second, those who, although lacking this power, nevertheless have the ability to direct a co-worker's labor to some ill-defined degree." *Id.*[10] And "supervisory status can usually be readily determined, generally by written documentation." *Id.* The Supreme Court also noted that because its definition of supervisor is relatively straightforward, the question

---

[9] The Court embraced its previous decision, *Ellerth*, 524 U.S. 742, noting *Ellerth* explained that coworkers

> can inflict psychological injuries by creating a hostile work environment, but they cannot dock another's pay, nor can one co-worker demote another. Only a supervisor has the power to cause direct economic harm by taking a tangible employment action. Tangible employment actions fall within the special province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control. . . .Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates.

*Vance*, 133 S. Ct. at 2448 (internal quotation marks and citations to *Ellerth* omitted).

[10] The four-justice dissent in *Vance* acknowledged that "[t]he Court today strikes from the supervisory category employees who control the day-to-day schedules and assignments of others, confining the category to those formally empowered to take tangible employment actions." 133 S. Ct. at 2455 (Ginsburg, J., dissenting).

13

will "very often be resolved as a matter of law before trial,"  *Id.* at 2450.

*Vance* clarified some of the conflict in the lower courts regarding the definition of a supervisor but did not address some of the nuances presented in these cases.  This Court, in *Browne v. Signal Mountain Nursery, L.P.*, 286 F.Supp.2d 904 (E.D. Tenn. 2003), anticipating *Vance*, discussed the same issue.  In *Browne*[11] the Court stated:

> In summary, an employee does not qualify as a "supervisor" for purposes of Title VII employer vicarious liability unless he or she is placed by the employer, formally or informally, in a position of superior authority and possesses some significant degree of control over the hiring, firing, demotion, promotion, transfer, or discipline of subordinates. Supervisory status is not a formulaic question of title, but a particularized inquiry into the nature and extent of the authority bestowed upon an employee by an employer. The authority entrusted in a supervisory employee need not be plenary or absolute, but it must encompass, in some significant way, the power to initiate, recommend, or effect tangible employment actions affecting the economic livelihood of the supervisor's subordinates.

*Id.* at 918.

In the modern workplace, a wide variety of supervisory situations will exist.  Companies are attempting to "flatten" the ranks of supervision and employ terms such as "coaches."  What does not change, however, is that an employer of any size with a substantial workforce must invest certain employees with tangible employment authority over other employees.  The question is in identifying these employees, i.e., supervisors.  In *Browne,* the Court endeavored to address that question.

The *Browne* definition is consistent with the holding in *Vance* and lends itself to more varied employment situations.  The majority in *Vance* noted that the key issue is not one of how the person is denominated but the authority the person wields.  *See* 133 S. Ct. at 2448 ( "This statement plainly

---

[11]This Court in *Browne* also rejected the EEOC definition of supervisor, holding that the EEOC definition was inconsistent with the policy rationale underlying Title VII and both *Ellerth* and *Faragher*.

ties the second situation to a supervisor's authority to inflict direct economic injury. It is because a supervisor has that authority—and its potential use hangs as a threat over the victim—that vicarious liability (subject to the affirmative defense) is justified."). The Court in *Vance* also recognized that a supervisor does not have to have sole or final authority. *See Id*. at 2446 n. 8 ("The dissent suggests that it is unclear whether Terry would qualify as a supervisor under the test we adopt because his hiring decisions were subject to approval by higher management. But we have assumed that tangible employment actions can be subject to such approval.") (internal citations omitted).

From parties' submissions it appears that the principal of Bradley Central, Shoemaker, did not have final decision-making authority with respect to hiring. Shoemaker's role included recommending personnel decisions to the Bradley County Director of Schools. Having such bifurcated responsibilities in personnel matters is fairly typical in government employment and is not foreign to private employers. *See Browne,* 286 F. Supp. 2d at 916 ("Almost all companies reserve final decisionmaking power in some person or entity other than the immediate supervisor and there is no reason to believe companies will ever be able to eschew the evaluative and administrative processes so completely that personnel decisions are formulated and influenced solely by individuals who have never had any contact with the subject employee."). In government employment in particular, the power to hire and fire is generally lodged in some central administrative body, while the actual supervision is done by others who work directly with the employees. These actual supervisors, however, exercise much more control over the tangible aspects of an employee's employment environment than a foreman or lead person or someone with more seniority. The actual supervisor's recommendations and evaluation carry substantial weight

and in the majority of cases would carry the day. Although Shoemaker did not have final decision-making authority, no one would doubt he qualified as a supervisor.

Thus, the answer to whether Ware qualifies as a supervisor is more complicated than just looking at his title. It requires the Court to look at his function and what if any influence he had on the ultimate decision to not renew Plaintiff's contract. Here, Plaintiff argues that Ware's "title indicated he was a supervisor, he was paid more for his position, he was the department head, [he admitted that people in the department should answer to him], he admittedly told Delozier what her job duties were, he participated in and influenced her hiring decision, and, most importantly, he played a part in her termination" (Court File No. 25, p. 17).

Most of these factors, however, are irrelevant under the *Vance* analysis. It does not matter how much Ware was paid or what his job title was. It would not even be dispositive if he directed Plaintiff's work to a significant extent. What is key is whether a jury could find the BCBE gave Ware the power to hire, fire, promote, reassign, or significantly change her benefits. This power need not be formally bestowed, need not be plenary, and need not be sole. An important fact in this case is Plaintiff's description of the meeting where she was informed of the decision to not renew her contract. According to Plaintiff, Shoemaker told her that "Kris and I had a meeting and decided this is the best course of action." This indicates that the decision was a joint decision between Shoemaker and Ware. And there is no indication Shoemaker had any reason for the decision other than what he had been told by Ware and Shoemaker's understanding of the difficulties between Ware and Plaintiff.

The deposition of Ware's wife, Holly, is also telling. From the record evidence, Holly learned about the nonrenewal of Plaintiff's contract before it happened or immediately after it

happened. Within hours of the decision, Holly communicated through Facebook to Plaintiff that Holly knew of the decision and gloated that Plaintiff was now experiencing the same type of pain that Plaintiff had inflicted upon Ware. This evidence could lead a reasonable jury to conclude that Holly learned of the decision from Ware and that Ware was substantially influential in the decision or perhaps even knew of the decision before Plaintiff was informed. Accordingly, there is a question of fact for the jury to decide regarding whether Ware was Plaintiff's supervisor.

### ii. Coworker

Even if the Court had concluded Defendants were correct on the issue of supervisory liability, the Court could not grant summary judgment under the coworker standards. Assuming Ware was a coworker rather than a supervisor, to hold the BCBE liable for a hostile work environment Plaintiff must show that "the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action." *Vanover v. White*, 3:07-CV-15, 2008 WL 2713711 (E.D. Tenn. July 10, 2008) (quoting *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir.2008)); *see also Vance*, 133 S. Ct. at 2439 ("If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions."). In other words, the BCBE "may be held liable for coworker harassment if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Hawkins*, 517 F.3d at 338.

The Court concludes that there is a question of fact regarding whether Ware informed Shoemaker during their conversation about Plaintiff that Plaintiff had previously accused Ware of sexual harassment. Even if Ware did not explicitly convey this to Shoemaker, there is the possibility that what he did say would have at least put Shoemaker on notice of possible sexual harassment.

Plaintiff has no way of knowing what exactly occurred during the conversation between Ware and Shoemaker, and it is suspicious that both Ware and Shoemaker are vague in describing the conversation and deny remembering any of its details. Further, Shoemaker only began considering not renewing Plaintiff's contract after speaking with Ware. Shoemaker openly acknowledged that there were problems and a lack of communication between the two teachers, yet without getting to the bottom of the "issues" between Ware and Plaintiff, Shoemaker recommended not renewing Plaintiff's contract, even though she had received excellent reviews and received no complaints (other than from Ware). Further, when Plaintiff later spoke with Glasscock, as she recalled, he said Ware no longer felt comfortable working with her after she accused him of sexual harassment.

Plaintiff's facts create an inference that Shoemaker knew, or at least had reason to know, about the sexual harassment. And rather than taking action to remedy the situation, Shoemaker took an adverse employment action against her. Viewing the facts in the light most favorable to Plaintiff, Principal Shoemaker's "response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Hawkins*, 517 F.3d at 338. Accordingly, the Court will **DENY** Defendants' motion for summary judgment on the hostile work environment claim.

### 2. Sex Discrimination

Plaintiff argues that her circumstantial case for sex discrimination survives the *McDonnell Douglas* burden-shifting framework applied at summary judgment. 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, the plaintiff carries the initial burden of establishing a prima facie case of discrimination. *Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 906 (6th Cir. 2002). To establish a prima facie claim of sex discrimination, Plaintiff must demonstrate that (1) she is a member of a protected class, (2) she was subject to an adverse employment action, (3) she

18

was qualified for the position in question, and (4) she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006).

Once Plaintiff establishes a prima facie case, the burden then shifts to Defendants to articulate some legitimate, non-discriminatory explanation for their actions. *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 463 (6th Cir. 2003) (citing *Burdine*, 450 U.S. at 253). Finally, the burden shifts back to the plaintiff to demonstrate the employer's explanation is pretext. *McDonnell Douglas*, 411 U.S. at 802-04, 807. Throughout this burden shifting, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *DiCarlo v. Potter*, 358 F.3d 408, 414-415 (6th Cir. 2004). The plaintiff cannot rely purely on "mere personal belief, conjecture and speculation" as they are insufficient to support an inference of discrimination. *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997) (internal alteration omitted).

Here, Defendants do not argue Plaintiff cannot make out a prima facie case for discrimination. Plaintiff is a woman, the facts show she was qualified for the job, and she was replaced by a male when her teaching contract was not renewed. In an effort to establish a non-discriminatory explanation, Defendants state that:

> Mr. Shoemaker decided not to renew the Plaintiff's employment because he was concerned about the work relationship between her and Mr. Ware. He formed the impression that the work relationship between these two employees had deteriorated to the point that they were no longer communicating and that the Plaintiff no longer wished to be at Bradley Central High School.

(Court File No. 30., p. 7). Even if, on its face, this is a legitimate, non-discriminatory explanation for not renewing Plaintiff, Plaintiff has put forth evidence to show this explanation is a pretext.

19

Defendants' explanation never addresses why Shoemaker did not make a concerted effort to understand *why* Ware and Plaintiff were not communicating and *why* it may have appeared Plaintiff did not want to be a school. An inference of discrimination is also supported by the fact that Plaintiff had very strong performance views, and Shoemaker only began considering not renewing Plaintiff's contract after she complained to Ware of sexual harassment. Further, Plaintiff only needs to show that her sex was *a* factor in the adverse employment action. As the Supreme Court explained in *Univ. of Texas Sw. Med. Ctr. v. Nassar*,

> An employee who alleges status-based discrimination under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act. So-called but-for causation is not the test. It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.

133 S. Ct. 2517, 2522-23 (2013).

The Court also notes that the United State Court of Appeals for the Sixth Circuit has expressed concern over defendants asserting the kind of subjective reasons for dismissing a worker as Defendants assert here. In *Brewer v. New Era, Inc*, the Sixth Circuit noted that it "has repeatedly emphasized that decisions made on the basis of subjective criteria, such as whether an employee is a team player or whether she would fit into a new corporate culture, can 'provide a ready mechanism for discrimination,' and thus should be 'carefully scrutinized.'" 564 F. App'x 834, 843 (6th Cir. 2014) (quoting *Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc*., 690 F.2d 88, 93 (6th Cir. 1982)). Here, deciding not to renew Plaintiff's contract on the basis of communication issues and a perception that she did not want to be school is subjective. It is similar to saying she was not a "team player." In the context of the instant case, the Court concludes Plaintiff has put forth facts sufficient for one to infer Ware's sex contributed to the adverse employment action and that

Defendants' explanation was pretext. Accordingly, the Court will **DENY** Defendants' motion for summary judgment on the sex-discrimination claim.

### 3. Retaliation

Plaintiff also argues her contract was not renewed in retaliation for her complaining about Ware's sexual harassment. A plaintiff complaining of retaliation must first establish a prima facie case by a preponderance of the evidence. *Burdine*, 450 U.S. at 252–53; *see also Johnson v. U.S. Dep't of Health & Human Servs.*, 30 F.3d 45, 47 (6th Cir. 1994). To establish a prima facie case of retaliation, a plaintiff must prove

> (1) she engaged in activity protected by [civil rights statutes]; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) (emphasis omitted) (citing *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990)). Once the prima facie case is made, the burden then shifts to the defendants to articulate some legitimate, non-discriminatory explanation for their actions. *Seay*, 339 F.3d at 463 (citing *Burdine*, 450 U.S. at 253). If this is accomplished, the burden shifts back to the plaintiff to demonstrate that the employer's explanation is pretext. *McDonnell Douglas*, 411 U.S. at 802-04, 807.

Defendants argue that it is "doubtful" Plaintiff engaged in any protected activity when she confronted Ware during a phone call in March 2012, even assuming she read from her notes, which explicitly mention sexual harassment. The Court concludes that there is a question of fact regarding whether Plaintiff directly complained of sexual harassment to Ware on that call. Further, a plaintiff is not required to complain to supervisors or top management; complaining to a coworker is

21

sufficient to satisfy the protected activity prong. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000) ("The Equal Employment Opportunity Commission ('EEOC') has identified a number of examples of 'opposing' conduct which is protected by Title VII, including complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices.").[12] Thus whether or not Ware was Plaintiff's supervisor (as explained above, there is a question of fact regarding this), her complaint to him would constitute protected activity.

Defendants contend that, even if the confrontation did constitute protected activity, Shoemaker had no knowledge of it when he made the decision to recommend Plaintiff's contract not be renewed, which means there is no causal connection between the protected activity and the adverse employment activity. "In order to show a causal connection, a plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Allen v. Michigan Dep't of Corr.*, 165 F.3d 405, 413 (6th Cir. 1999) (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)). Defendants argument fails because the Court has already concluded that there is sufficient evidence for the jury to decide whether Ware was Plaintiff's supervisor. If he was, the jury could also find that his role in her contract's nonrenewal stemmed directly from her complaint of sexual harassment.

But even if Ware is not Plaintiff's supervisor, her employer may still be liable for retaliation. As explained above, Plaintiff has raised a question of fact regarding whether Ware directly informed

---

[12] Further, a plaintiff need only have a "reasonable and good faith belief" that the harassing acts she was reporting were violations of Title VII. *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th Cir. 2012).

Shoemaker of the sexual harassment allegation, or whether Shoemaker understood from his conversation with Ware that sexual harassment had likely occurred. The causal connection is further strengthen by the fact that Shoemaker first began considering not recommending Plaintiff's contract be renewed after Plaintiff complained to Ware about sexual harassment and then Ware spoke with Shoemaker. Furthermore, Plaintiff had received excellent reviews and no complaints (other than Ware's), yet Shoemaker decided to recommend her contract not be renewed because of subjective reasons—i.e. communication issues and Shoemaker's perception that Plaintiff did not want to be at school.

Thus the circumstantial evidence supports an inference that Plaintiff's contract was not renewed because she complained of sexual harassment. There is also sufficient evidence to demonstrate that any legitimate reasons offered for nonrenewal are overcome by a showing that they were merely pretext for taking an adverse employment action based on her protected activity.[13] Accordingly, the Court will **DENY** summary judgment on the retaliation claim.

### 4. McDaniel

Plaintiff's amended complaint alleges McDaniel is liable in his individual capacity as an aider and abettor under Title VII and the THRA. With respect to Title VII, the Sixth Circuit has explained that "the statute as a whole, the legislative history and the case law support the conclusion that Congress did not intend individuals to face liability under the definition of 'employer.'" *Wathen*

---

[13] The Court recognizes that "Title VII retaliation claims require proof that the desire to retaliate was the *but-for* cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013). This is different from status-based discrimination under Title VII (such as the sex-discrimination claim Plaintiff also brings), which only require that the discriminatory motive was *one* of the motives behind the adverse employment action. *Id.* at 2522-23. The Court does not have trouble concluding Plaintiff has presented evidence showing that but-for her protected activity, her contract would have been renewed.

*v. Gen. Elec. Co.*, 115 F.3d 400, 405-06 (6th Cir. 1997) (further noting that "an individual employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII"). Because the BCBE and not McDaniel is Plaintiff's employer for purposes of Title VII, the Court will **GRANT** summary judgment on the Title VII claims against McDaniel in his individual capacity.

The "THRA is broader than Title VII in terms of who may be held liable for harassment and discrimination." *Carr v. UPS*, 955 S.W.2d 832, 835 (Tenn. 1997), *overruled on other grounds by Parker v. Warren Cnty. Util. Dist.*, 2 S.W.3d 170 (Tenn. 1999). Although there is generally no individual liability under the THRA, "an individual who aids, abets, incites, compels, or commands an employer to engage in employment-related discrimination has violated the THRA." *Id.* at 836. A defendant "cannot be held individually liable under the THRA for taking any actions adverse to [the plaintiff's] terms and conditions of employment that are within the legitimate scope of [the defendant's] delegated management authority." *Crutchfield v. Aerospace Ctr. Support*, No. 98-6105, 1999 WL 1252899, at *2 (6th Cir. Dec. 14, 1999). Such liability occurs only if the individual performs an act that is "separate and distinct from acting as a supervisor." *Eppes v. Enterprise Rent-A-Car Co.*, No. 3:05-CV-458, 2007 WL 1170741, at *11 (E.D. Tenn. Apr. 18, 2007).

Here, the Court agrees with Defendants that McDaniel cannot be held individually liable as an aider and abettor under the THRA. McDaniel stated in deposition that he had no involvement in this matter other than simply relying on Principal Shoemaker's recommendation that Plaintiff's contract not be renewed and that it was his practice to rely on principals' personnel recommendations. Plaintiff has not presented evidence to the contrary. Because there is no evidence McDaniel acted outside the legitimate scope of his delegated authority, the Court will

24

**GRANT** summary judgment on the THRA claims against him in his individual capacity.

**B. Section 1983**

Plaintiff asserts claims under 42 U.S.C. § 1983 for violations of her rights under the First Amendment and her due process and equal protection rights under the Fourteenth Amendment. Defendant moves for summary judgment on the First Amendment claims, noting Plaintiff included nothing regarding that cause of action in her amended complaint except for mentioning the amendment. The Court agrees Plaintiff has not stated a claim for violation of her First Amendment rights and thus will **GRANT** Defendants' motion for summary judgment on the First Amendment claim. Similarly, Plaintiff's evidence does not support a due process claim, as she does not even attempt to show she was deprived of a property interest. There is no state-recognized property interest in the renewal of a nontenured teacher's employment contract in Tennessee.[14] *See Rowe v. Bd. of Educ. of City of Chattanooga,* 938 S.W.2d 351, 355 (Tenn. 1996). Accordingly, the Court will **GRANT** Defendants' motion for summary judgment on the due process claim.

Regarding the equal protection claim, the Court notes that "[i]ndividuals have a right, protected by the Equal Protection clause of the Fourteenth Amendment, to be free from discrimination on the basis of sex in public employment." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004)). To state a general claim under 42 U.S.C. § 1983, a plaintiff must "demonstrate that a person acting under color of state law 'deprived [him] of rights, privileges or

---

[14] To have a property interest in something "a person clearly must have more than an abstract need or desire for it. [She] must have more than a unilateral expectation of it. [She] must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*

immunities secured by the Constitution or laws of the United States.'" *Barker v. Goodrich*, 649 F.3d 428, 432 (6th Cir. 2011) (citing *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005)). Here, it is not disputed that Defendants acted under the color of state law. And because discrimination claims raised pursuant to § 1983 are governed by the Title VII legal framework, the Court's above analysis concluding Plaintiff has presented facts sufficient to show sex discrimination occurred applies here as well. *See Williams v. Zurz*, 503 F. App'x 367, 374 (6th Cir. 2012) (citing *Smith v. City of Salem, Ohio*, 378 F.3d 566, 577 (6th Cir. 2004). However, the Court must still analyze whether Defendants may be held liable under § 1983.

### 1. McDaniel

The qualified immunity doctrine shields government officials performing discretionary actions from civil damages liability as long as their actions reasonably could have been thought consistent with the rights they are alleged to have violated. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Even if a government official deprives a plaintiff of a federal right, "qualified immunity will apply if an objective reasonable officer would not have understood, by referencing clearly established law, that his conduct was unlawful." *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The plaintiff bears the burden of showing a defendant is not entitled to qualified immunity. *See Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

As explained in the above section analyzing McDaniel's lack of individual liability under the THRA, there is no evidence he had any knowledge of the allegedly improper reasons for the recommendation that Plaintiff's contract not be renewed. Because a reasonable official in

McDaniel's position would not have realized that what he did was unlawful under clearly established law, he is entitled to qualified immunity and the Court will **GRANT** summary judgment on the § 1983 claim against him in his individual capacity.

### 2. BCBE

A municipality cannot be liable under a *respondeat superior* theory for § 1983 violations. *Spears v. Ruth*, 589 F.3d 249, 256 n.6 (6th Cir. 2009) (citing *Monell*, 436 U.S. at 691). Rather, municipalities are liable when they "have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Cash*, 388 F.3d at 542 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)). A § 1983 plaintiff can draw from one of four sources to establish a municipality's liability for an illegal custom or policy: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Spears*, 589 F.3d at 256 (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir.2005)). A plaintiff bears the burden of showing "that the unconstitutional policy or custom existed, that the policy or custom was connected to the [municipality], and that the policy or custom caused [the] constitutional violation." *Napier v. Madison Cnty.*, 238 F.3d 739, 743 (6th Cir. 2001).

Here, Plaintiff presents no evidence that there were any legislative enactments or policies in place tolerating sex discrimination at Bradley Central, that the BCBE failed to adequately train or supervise employees, or that there was a custom of tolerance or acquiescence of federal rights violations. Plaintiff notes that "even a single employment action can be an official municipal policy, so long as the decision-maker acts with governmental authority." While this is certainly a correct

point of law, Plaintiff does not apply it to the present case. Viewing the facts in the light most favorable to Plaintiff, the Court cannot conclude that a final decision maker, McDaniel, acted with the requisite improper motive necessary to implicate municipal liability. Accordingly, the Court will **GRANT** summary judgment on the § 1983 claim against the BCBE.

## IV.     CONCLUSION

For the foregoing reasons, the Court will **GRANT IN PART and DENY IN PART** Defendants' motion for summary judgment (Court File No. 21). Specifically, the Court will **DISMISS** the Section 1983 claims and **DISMISS** all claims against McDaniel in his individual capacity. Remaining are the Title VII and THRA claims against the BCBE for sex discrimination, hostile work environment, and retaliation.

**An order shall enter.**

**/s/**_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**